**SO ORDERED.**

**SIGNED this 04 day of June, 2007.**



*Dale L. Somers*
Dale L. Somers
**UNITED STATES BANKRUPTCY JUDGE**

_____

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF KANSAS

In Re:

JOHN W. PATTERSON,                          CASE NO. 05-27015-7
                                                              CHAPTER 7
                          DEBTOR.

TROY SELLNER,

                          PLAINTIFF,

v.                                                            ADV. NO. 06-6025

JOHN W. PATTERSON,

                          DEFENDANT.

**OPINION DENYING MOTION TO STRIKE DEFENDANT'S RESPONSE TO**

**PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT, AND DENYING**

**PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

This proceeding is before the Court on the Plaintiff's motion for summary judgment, and his motion to strike the Defendant-Debtor's response to the motion. The Plaintiff appears by counsel Luke A. Sobba and Karl R. Swartz of Morris, Laing, Evans, Brock & Kennedy, Chartered, of Topeka and Wichita, Kansas, and J. Michael Dady of Dady & Garner, P.A., of Minneapolis, Minnesota. The Defendant-Debtor appears by counsel Conrad Miller, Jr., of Laster & Miller of Lenexa, Kansas. The Court has reviewed the relevant materials and is now ready to rule.

In January 2004, the Plaintiff entered into an agreement with the Debtor's company to help him establish an auto consulting business. The Plaintiff's new business, located in Minnesota, was not successful. Among other things, he contends: (1) the company's transaction with him constituted a sale of a franchise under the Minnesota Franchises Act; (2) the company violated that Act in various ways that constitute fraud; (3) the Debtor is jointly and severally liable to him for the company's fraud; and (4) the Debtor's liability should be excepted from discharge by § 523(a)(2)(A) of the Bankruptcy Code. The Plaintiff now moves for partial summary judgment, and also moves to strike the Debtor's response as untimely filed. As explained below, the Court will deny the motion to strike, and will deny the Plaintiff's motion for summary judgment.

**FACTS**

The Debtor has a company called American Auto Consultants, Inc. ("Consultants"), located in Overland Park, Kansas. In January 2004, on behalf of Consultants, he sold an auto consulting business opportunity to Troy Sellner, whose

address was in Mankato, Minnesota. The contract described Consultants as "a

professional advisor and consultant in the area of new vehicle purchases." Under their

agreement, Sellner was to pay Consultants $22,500 in return for various materials,

supplies, and services, including "comprehensive personal training at [Sellner's] home or

office," a computer, automobile rebate information that was to be regularly updated, and

new car pricing software. Sellner was also to pay an annual fee of $700 to continue to

receive updated rebate information and pricing software. Consultants was to allow

Sellner to use its "New/Used and collectable Vehicle Research and Locating Service" for

$50 per request. Neither the Debtor nor Consultants ever gave Sellner a "public offering

statement," as defined by the Minnesota Franchises Act,[1] about the sale. Sellner's

agreement with Consultants included a provision saying Sellner understood and agreed

the contract would be "governed, enforced and carried out by the laws of the state of

Kansas."

   According to Sellner, the Debtor gave him a "Marketing and Business Guide" cd-

rom that contained sample forms encouraging him to state in advertising materials: "We

are affiliated with American Auto Consultants, Inc., successfully serving over 60,000

clients since 1979." He contends the Debtor and Consultants authorized him to tell his

customers that he was an affiliate of Consultants. In his summary judgment brief, Sellner

alleges the Debtor admitted these facts during a deposition. However, the page where the

---

[1]Minn. Stat. Ann. §§ 80C.01 through 80C.22 (Thomson/West 2007). Sellner refers to the public offering statement as a "uniform franchise offering circular," although the Court did not find this phrase in the MFA.

3

Debtor supposedly admitted them was not included in the selected deposition pages submitted with the motion. After the Debtor pointed out in his response that no such admission was made in the pages attached to Sellner's motion, Sellner filed a reply brief, but still did not attach the cited page. Nevertheless, for purposes of this motion, the Court will assume Consultants authorized Sellner to tell his customers he was an affiliate of Consultants.

In his summary judgment brief, Sellner alleged neither the Debtor nor Consultants was registered to sell franchises in Minnesota when the Sellner-Consultants contract was formed. After the Debtor pointed out the cited page in his deposition included only an admission that he personally was not registered to sell franchises in Minnesota, Sellner stated in his reply brief that an affidavit from a Minnesota state official concerning Consultants was attached, although it was not in fact attached. For present purposes, though, the Court will assume Sellner can establish that Consultants was not registered to sell franchises in Minnesota.

Sellner filed his motion for summary judgment on November 20, 2006. Under local rules, the Debtor had twenty-three days to respond to the motion.[2] Instead, he filed his response on January 17, 2007. Relying on that tardiness, Sellner filed a motion to strike the response and, under a local District Court rule, to treat his motion as

---

[2]D. Kan. Local Bankr. R. 7056.1(d) (2006); D. Kan. Local R. 6.1(d)(2) (2006).

4

uncontested and grant it without further notice.[3]  Although the Debtor did not file a

motion in this adversary proceeding for an extension of time to respond to Sellner's

motion, on December 20, he did file such a motion in his main bankruptcy case, asking

for thirty more days to respond.[4]  The Court's filing system sent an electronic notice of

the filing of that motion to one of the Plaintiff's attorneys, although the docket text

described it as "Motion to Extend Time to Motion to Patial [sic] Summary Judgment."

The motion for an extension of time was filed seven days after the expiration of the

response time set by the local rule.  In the motion for time, the Debtor's counsel stated the

response was due on the day the extension was requested, indicating he was not aware the

response time had already passed.  He said he would be out of the jurisdiction from

December 14 to December 26, 2006, and "due to a heavy docket prior to departure"

would be unable to respond by the day he thought the response was due.

     Attached to the Debtor's response to Sellner's summary judgment motion were

copies of the documents that were attached to Sellner's motion, and a partial,

unauthenticated copy of a document that appears to be Sellner's response to the Debtor's

request for admissions.  The Debtor did not cite those admissions to support any facts

alleged in his brief, and the Court has not considered the possible admissions in resolving

Sellner's motion.

---

[3]*See* D. Kan. Local R. 7.4 (2006) (uncontested motion "ordinarily will be granted without further notice").

[4]*See* Docket no. 23, filed December 20, 2006, in Case No. 05-27015-7.

**DISCUSSION**

*1.     The parties' arguments*

In his summary judgment motion, Sellner contends the Debtor owes him a debt that should be excepted from discharge by § 523(a)(2)(A) of the Bankruptcy Code.  That provision applies to debts "for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by — (A) false pretenses, a false representation, or actual fraud."  In assessing claims under this provision, "[t]he bankruptcy court must consider whether the totality of the circumstances 'presents a picture of deceptive conduct by the debtor which indicates an intent to deceive the creditor.'"[5]  Usually, the debtor concedes he or she owes the debt involved in the § 523(a)(2)(A) claim, and disputes only whether the debt should be excepted from discharge.  Here, however, Sellner must also establish that the Debtor owes him a debt as a result of the Sellner-Consultants contract.  Assuming he can make that showing, he must establish additional facts to bring the debt under § 523(a)(2)(A).  Establishing an exception to discharge based on misrepresentation requires proving the following elements:  (1) the debtor made a representation; (2) at the time of the representation, the debtor knew it to be false; (3) the debtor made the representation with the intent to deceive the creditor; (4) the creditor justifiably relied on the representation; and (5) the

---

[5] *Groetken v. Davis (In re Davis)*, 246 B.R. 646, 652 (10th Cir. BAP 2000), *quoting* 3 William L. Norton, Jr., Norton Bankruptcy Law and Practice 2d 47:16, n. 62 (1999).

6

creditor sustained damage as a proximate result of the debtor making the representation.[6]

Sellner has the burden of proving all these elements by a preponderance of the evidence.[7]

Sellner seeks summary judgment on the first count of his complaint. He alleges: (1) Consultants violated the Minnesota Franchises Act ("MFA") by (a) failing to register under the MFA, and (b) failing to make disclosures required by the MFA; (2) based on those failures, Sellner is entitled to rescind his agreement with Consultants, and recover rescissionary damages; (3) under the MFA, the Debtor is jointly and severally liable for Consultants' violations because he materially aided Consultants in the Sellner-Consultants transaction; and (4) the rescissionary damages Sellner is entitled to recover are excepted from discharge by § 523(a)(2)(A) because the Debtor's and Consultants' violations of the MFA constituted fraud.

In his response to Sellner's motion, in effect disputing Sellner's asserted right to rescind the contract and recover rescissionary damages, the Debtor argues Sellner has not established that he or Consultants violated the MFA because: (1) the provision in the Sellner-Consultants contract stating that Kansas law would control any disputes prevents the MFA from applying to the contract; (2) Sellner's evidence fails to establish the transaction qualified as a sale of a franchise under the MFA because (a) the deposition

---

[6] *E.g., Fowler Bros. v. Young (In re Young),* 91 F.3d 1367, 1373 (10th Cir. 1996) (identifying these five elements of § 523(a)(2)(A) claim, but requiring creditor's reliance to be reasonable); *Field v. Mans*, 516 U.S. 59, 69-76 (1995) (reliance under § 523(a)(2)(A) need only be justifiable, overruling *Fowler Bros.* to extent it required reliance to be reasonable).

[7] *Grogan v. Garner*, 498 U.S. 279, 287 (1991).

7

page on which the Debtor allegedly admitted authorizing Sellner to use Consultants' name, mark, or logo in his business was not attached to Sellner's motion, and (b) Sellner's right under the contract to use Consultants' vehicle research and locating service for $50 per request does not establish the existence of a "community of interest" between Sellner and Consultants; (3) the money Sellner was to pay Consultants under their contract has not been shown to be a franchise fee because Consultants was not selling a franchise; and (4) the contract was a kind exempted from the MFA. The Debtor contends that the alleged violations of the MFA do not necessarily amount to fraud covered by § 523(a)(2)(A), but at most would establish the misrepresentation element under that provision.

2.      *Summary judgment standards*

Under the applicable rules of procedure, the Court is to grant summary judgment if the moving party demonstrates that there is "no genuine issue of material fact" and that the party "is entitled to a judgment as a matter of law."[8] The substantive law identifies which facts are material.[9] A dispute over a material fact is genuine when the evidence is such that a reasonable fact finder could resolve the dispute in favor of the party opposing the motion.[10] In adjudicating disputes, bankruptcy courts usually both determine the law and find the facts. In deciding a summary judgment motion, though, the Court is limited to its role of deciding legal questions, not weighing the evidence and resolving factual disputes,

---

[8]Fed. R. Civil P. 56(c), made applicable by Fed. R. Bankr. P. 7056.

[9]*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

[10]*Id.*

8

but merely determining whether the evidence favorable to the non-moving party about a material fact is sufficient to require a trial[11] at which the Court would act in its fact-finding role. Summary judgment is inappropriate if an inference can be drawn from the moving party's materials that would allow the non-moving party to prevail at trial.[12]

The substantive law's allocation of the burden of proof also affects the Court's analysis of a summary judgment motion. The party asking for summary judgment has the initial burden of showing that no genuine issue of material fact exists.[13] Since Sellner will also have the burden of proof at trial, he is entitled to summary judgment only if the evidence presented establishes that, at trial, a reasonable fact finder will only be able to conclude: (1) the Debtor owes him a debt for violating the MFA, and (2) the five elements required for § 523(a)(2)(A) to except that debt from discharge all exist. If a reasonable fact finder could instead conclude either that the Debtor does not owe Sellner a debt under the MFA or that any one of the five elements does not exist, Sellner's motion for summary judgment must be denied.

3.      *Should the Court consider the Debtor's tardy response to the Plaintiff's motion for summary judgment?*

As a preliminary matter, the Court must decide whether to consider the Debtor's response to Sellner's motion for summary judgment. As indicated, the response was

---

[11]*Id.* at 249-52.

[12]*Id.* at 248.

[13]*Shapolia v. Los Alamos Nat'l Lab.,* 992 F.2d 1033, 1036 (10th Cir. 1993).

9

already a week late when the Debtor's attorney asked for more time to respond, mistakenly filing his motion in the main case instead of this adversary proceeding. Since notice of the motion for an extension of time went to one of Sellner's attorneys, the Court is inclined to treat the misfiling of the motion as excusable neglect, even in light of counsel's lack of awareness of the response time set by the local rules applicable in this Court. Under the circumstances of this case, the Court will not strike the response and will not grant Sellner's summary judgment motion simply because the response was filed late.

Under the applicable rules, "When a motion for summary judgment is made and supported as provided in [Civil Rule 56], an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, *if appropriate*, shall be entered against the adverse party."[14] By saying an unopposed motion should be granted only if summary judgment is appropriate, the rule makes clear that the opposing party's failure to respond to a motion does not automatically entitle the moving party to summary judgment.[15] Instead, the Court is required to determine for itself whether the moving party has established that summary judgment is "appropriate." The Debtor did not attempt to defeat Sellner's motion by submitting conflicting evidence, but merely by pointing out alleged deficiencies in Sellner's evidence and arguments. Since the Court would be required to analyze the

---

[14]Fed. R. Civ. P. 56(e) (emphasis added), made applicable here by Fed. R. Bankr. P. 7056.

[15]*John v. Louisiana Board of Trustees*, 757 F.2d 698, 709-10 (5th Cir. 1985).

motion even if the Debtor had never filed a response, consideration of the Debtor's arguments will simply help the Court accomplish that task. The fact Sellner replied to the substance of the Debtor's response indicates its tardiness has not prejudiced his presentation of his claims. Sellner's request to strike the Debtor's response is denied.

4.    *Has Sellner established that he is entitled under the MFA to rescind the contract and recover damages from the Debtor?*

The Minnesota Franchises Act regulates franchises in a variety of ways, and defines "franchise" broadly. Here, Sellner relies on the following portion of the definition:

(a) "Franchise" means (1) a contract . . . :

> (i) by which a franchisee is granted the right to engage in the business of offering goods or services using the franchisor's trade name, trademark, service mark, logotype, advertising, or other commercial symbol or related characteristics;
>
> (ii) in which the franchisor and franchisee have a community of interest in the marketing of . . . services at wholesale, retail, by lease, agreement, or otherwise; and
>
> (iii) for which the franchisee pays, directly or indirectly, a franchise fee.[16]

After considering the evidence presented, the Court concludes at most only one of the three elements of a franchise under this definition has been established for summary judgment purposes.

Sellner's own affidavit is the only evidence supporting his claim that Consultants authorized him to use its name in his advertising materials and to tell his customers he was an affiliate of Consultant. The Sellner-Consultants contract says nothing about Sellner's

---

[16]Minn. Stat. Ann. § 80C.01, subd. 4(a)(1).

11

right to use Consultants' name.  On the other hand, the Debtor could easily have presented his own affidavit denying Sellner was authorized to use the name, but chose instead merely to point out the cited page of his deposition was not attached to Sellner's motion. If the Court's resolution of Sellner's motion turned on whether the Debtor actually made this admission, the Court would direct the parties to submit the cited deposition page. Since that is not the case, the Court will instead assume the Debtor admitted, as Sellner alleges, that Sellner was authorized to use Consultants' name in advertisements for his business, and that this first element of the MFA's definition of a "franchise" has been established.[17]

Neither the Sellner-Consultants contract nor anything else Sellner has presented establishes, however, that the parties had a "community of interest."  The phrase is not defined in the MFA, but Minnesota case law has provided some guidance for interpreting it.  In *Martin Investors, Inc., v. Vander Bie*,[18] the Minnesota Supreme Court upheld a trial court's conclusion that the plaintiff and defendant had a "community of interest" where the defendant had a right to one percent of the proceeds of each loan the plaintiff placed through the use of the defendant's computer database of lenders, because the plaintiff and defendant would share fees from a common source, the borrower.  In *Unlimited Horizon*

---

[17]*See RJM Sales & Marketing, Inc., v. Banfi Products Corp.*, 546 F.Supp. 1368, 1373 (D. Minn. 1982) (use of alleged franchiser's name in advertising material satisfies trade name requirement, citing *Martin Investors, Inc., v. Vander Bie*, 269 N.W.2d 868, 874 (Minn. 1978)).

[18]269 N.W.2d 868, 874-75 (Minn. 1978).

*Marketing, Inc., v. Precision Hub, Inc.*,[19] the Minnesota Court of Appeals relied on *Martin Investors* to support its conclusion that a manufacturer of a machine and a distributor with an exclusive contract to sell the machine had a community of interest because they would each profit from a common source on marketing and selling the machine.

Sellner contends he and Consultants had a community of interest because he would have to pay Consultants $50 each time he used its vehicle research and locating service, so the more customers he signed up for his consulting service, the more Consultants would also benefit. The Court cannot agree that this arrangement necessarily establishes the required community of interest between Sellner and Consultants. Their contract does not appear to require Sellner to use Consultants' research and locating service or preclude him from using other methods to locate vehicles for his customers. Furthermore, his obligation to pay Consultants for using its service is not contingent on the service producing a sale for him. By contrast, in *Martin Investors*, the defendant was entitled to a percentage every time the plaintiff succeeded in placing a loan using the defendant's database, and in *Unlimited Horizon*, the manufacturer could make no profit unless the distributor sold its machines since the distributor had the exclusive right to sell them. The evidence presented would not require a reasonable fact finder to conclude Sellner and Consultants had a community of interest.[20]

---

[19]533 N.W. 2d 63, 66 (Minn. Ct. App. 1995).

[20]*See* Mark H. Miller, *Unintentional Franchising*, 36 St. Mary's L.J. 301, 335-40 (2005) (discussing ways statutes and courts in different states have defined "community of interest" element of "franchise" definition).

Furthermore, while Sellner was to pay Consultants an initial fee of $22,500 and an annual $700 fee to renew some pricing software and a rebate schedule, Sellner has not established that either of these fees qualifies as a "franchise fee" under the MFA. As relevant here, the MFA defines "franchise fee" as "any fee or charge that a franchisee . . . is required to pay or agrees to pay for the right to enter into a business or to continue a business under a franchise agreement, including, but not limited to, . . . any payment for goods or services, or any training fees or training school fees or charges."[21] The Court sees nothing in the Sellner-Consultants contract that gives Sellner "the right to enter into a business" under the agreement. The contract simply calls for Consultants to provide Sellner with various materials, supplies, and services. Nothing Sellner has presented indicates he was required to use Consultants' services in conducting his business, or shows that Consultants had any right to control how he conducted his business. The evidence presented would not require a reasonable fact finder to conclude the money Sellner was to pay Consultants constituted a "franchise fee" under the MFA.

The Debtor argues that the Sellner-Consultants contract was covered by an exception to the MFA's definition of a "franchise." The exception provides that "'Franchise' does not include a contract . . . between a new motor vehicle manufacturer, distributor, or factory branch and a franchisee whereby the franchisee is granted the right to market automobiles [or other vehicles]."[22] As Sellner points out, the parties' contract

---

[21]Minn. St. Ann. § 80C.01, subd. 9.

[22]Minn. Stat. Ann. § 80C.01, subd. 4(d).

14

states that Consultants "is a professional advisor and consultant in the area of new vehicle purchases." Consultants is not a new vehicle manufacturer, distributor, or factory branch, so the Court concludes this exception does not apply to the Sellner-Consultants contract, and the exception does not prevent the MFA from applying to the parties' contract. Nevertheless, Sellner's failure to establish the elements necessary to show the Sellner-Consultants contract was a sale of a franchise under the MFA precludes granting his summary judgment motion.

5.    *Sellner's evidence is not sufficient to enable the Court to determine whether Kansas or Minnesota law should apply to the issues raised by Sellner's motion for partial summary judgment.*

The Debtor suggests the choice of law provision in the Sellner-Consultants contract prevented the MFA from applying. So far as the Court is aware, Kansas has no specialized law like the MFA that regulates franchise sales, and Sellner makes no claims under Kansas law in his motion. But Sellner does point out that the MFA includes a provision that would prevent the agreed choice of law from excusing the Debtor's and Consultants' failure to comply with the MFA (assuming the Sellner-Consultants contract was a sale of a franchise under that Act):

> Any condition, stipulation or provision, including any choice of law provision, purporting to bind any person who, at the time of acquiring a franchise is a resident of this state, . . . or purporting to bind a person acquiring any franchise to be operated in this state to waive compliance or which has the effect of waiving compliance with any provision of [the MFA] or any rule or order thereunder is void.[23]

---

[23]Minn. Stat. Ann. § 80C.21.

The MFA includes another provision stating the MFA applies "when a sale or offer to sell is made in this state, when an offer to purchase is made and accepted in this state, or when the franchise is to be located in this state."[24] There can be no doubt that the MFA includes a variety of provisions regulating franchise sales to which it applies, and Sellner bases his summary judgment motion entirely on the MFA. The materials before the Court do not indicate, however, where the parties performed any of the acts that culminated in the Sellner-Consultants contract. Sellner swears in his affidavit that he operated his business in Minnesota, and the Debtor has submitted no evidence to contradict that assertion. The contract itself listed a Minnesota address for Sellner, indicating either that he was a resident of that state or that his business was or would be located there. These circumstances, coupled with the fact Sellner has asserted his claims in the Debtor's bankruptcy case before this Court, which is located in Kansas, raise the question whether Kansas or Minnesota law should apply to the parties' dispute.

The Tenth Circuit has said: "A federal court adjudicating state law claims must apply the forum state's choice of law principles."[25] Although the dischargeability under § 523(a)(2)(A) of any debt the Debtor might owe to Sellner is exclusively a bankruptcy issue, the question whether the Debtor does owe Sellner a debt is a state law issue. Since

---

[24]Minn. Stat. Ann. § 80C.19, subd. 1.

[25]*Dang v. UNUM Life Ins. Co. of America*, 175 F.3d 1186, 1190 (10th Cir. 1999) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496)).

Case 06-06025    Doc# 67    Filed 06/04/07    Page 16 of 26

this Court sits in Kansas, it must apply Kansas choice of law principles to determine what state's law governs the Debtor's liability to Sellner.

Sellner argues the Court should apply the Kansas choice-of-law doctrine of *lex loci delicti* (literally, the "law of the place where the tort or other wrong was committed"[26]) because his claims are "fraud-based." While Sellner may be asserting some fraud claims in this proceeding, his motion for partial summary judgment is based solely on his claims that the Debtor and Consultants violated the MFA by failing to register the franchise they sold him and failing to provide him with a public offering statement. As the Court reads it, the MFA regulates franchise sales by requiring the franchise seller to take certain steps (such as registering the franchise with a state agency and giving a public offering statement to each potential buyer) before making any sales, and allows the buyer to rescind the sale contract, as Sellner is trying to do here, if the seller has not completed those steps. Failing to take the required steps, however, might result from simple ignorance of the MFA's requirements or a belief the MFA did not apply to the transaction, rather than from any scheme to defraud franchise buyers. Since Sellner alleges in his summary judgment motion that Consultants' contract with him was made invalid by the MFA based on failures that do not necessarily include any fraud, his claims raise contract-formation questions, not fraud or other tort questions. Consequently, the *lex loci delicti* doctrine does not apply.

---

[26]Black's Law Dictionary (8th ed. 2004), obtained from Westlaw (Thomson/West 2007).

The Debtor suggests the Sellner-Consultants transaction had a reasonable relationship to Kansas, so the policy of both Kansas and federal law to enforce parties' freedom of contract should trump the Minnesota policy expressed in the MFA's voiding of choice of law provisions. Kansas statutes and cases recognize that the parties to a contract have some right to choose what state's law governs their transaction.[27] For example, in a case where a Kansas resident sold a horse at an auction in Kentucky to some Florida residents, the Kansas Supreme Court indicated a clause calling for the sale contract to be construed and governed by Kentucky law was enforceable because the transaction bore a reasonable relationship to Kentucky, and held another clause calling for jurisdiction and venue over any dispute to be fixed in the seller's home county in Kansas was fair and reasonable, and bore a reasonable relationship to the transaction because one of the parties to the contract lived there, so the buyer's consent to the clause gave the Kansas court personal jurisdiction over the buyer.[28] This facet of Kansas law indicates Kansas state courts might honor the choice of law provision in the Sellner-Consultants contract.

---

[27]*See* Terry Savely Bezek, *Conflict of Laws: A Guide to Navigating the Dismal Swamp*, 21 J. Kan. Bar Ass'n 21, 25 (2002). For example, the Kansas Uniform Commercial Code, K.S.A. 2006 Supp. 84-1-105(1), provides that, with certain exceptions, "when a tranaction bears a reasonable relation to this state and also to another state or nation the parties may agree that the law either of this state or of such other state or nation shall govern their rights and duties." Stating this statute indicated the "legislature's intent that territorial restrictions should not hinder commerce," the Kansas Supreme Court cited it to support a decision to allow the parties' choice of Missouri law in a loan and mortgage executed in Missouri on land located in Kansas to apply to the question whether a future advance clause in a mortgage covered a later loan. *Mark Twain Kansas City Bank v. Cates*, 248 Kan. 700, 706-07 (1991).

[28]*Vanier v. Ponsoldt*, 251 Kan. 88, 94 & 99-101 (1992).

18

On the other hand, while Kansas state courts usually say they still follow the Restatement (First) of Conflict of Laws (1934) on choice of law questions,[29] the Kansas Supreme Court has pointed out that the First Restatement did not either bar or recognize the parties' choice of law in a contract.[30]  In  *Brenner v. Oppenheimer & Company*, the Kansas Supreme Court refused to allow a provision in the parties' contract to resolve a choice-of-law question, ruling instead that a strong Kansas public policy to regulate securities transactions for the protection of Kansas investors required the application of Kansas law instead of another state's law.[31]  This case is the reverse of *Brenner*, though, because the non-forum state, Minnesota, is the one that has a strong public policy, as the MFA makes clear, to protect its residents by regulating the sales of franchises to them, while Kansas has no public policy to regulate sales of franchises or to provide special protections to either party to an agreement like the Sellner-Consultants contract.  The Court has not found any Kansas case dealing with this choice of law problem.  Kansas state court decisions have sometimes referred to the Restatement (Second) of Conflict of Laws (1971).[32]  Since the First Restatement did not deal with contractual choice-of-law provisions but the Second Restatement does, the Court predicts Kansas state courts would

---

[29]*ARY Jewelers, L.L.C., v. Krigel*, 277 Kan. 464, 481 (2004).

[30]*Brenner v. Oppenheimer & Co.*, 273 Kan. 525, 538 (2002);  *see also* 1 Restatement (Second) of Conflict of Laws 2d:  Contracts at 558, Item 2 ("The Changes") preceding § 186 (1971) ("[T]he original Restatement did not acknowledge any power in the parties to choose the applicable law.  The present Chapter recognizes that the parties have such power subject to certain limitations (see § 187).")

[31]273 Kan. 538-49.

[32]Bezek, *Conflict of Laws*, 21 J. Kan. Bar. Ass'n at 22 & n. 10.

19

look to the Second Restatement if they were faced with the question now before this

Court.

As relevant here, § 187 of the Second Restatement says:

(2)  The law of the state chosen by the parties to govern their contractual rights and duties will be applied . . . unless . . .
. . .
(b)  application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which, under the rule of § 188, would be the state of the applicable law in the absence of an effective choice of law by the parties.[33]

A comment to § 187 explains a state's interests can override the parties' choice of law, and

lead the forum court to apply that state's law instead, but "[a]pplication of the chosen law

will be refused only (1) to protect a fundamental policy of the state which, under the rule

of § 188, would be the state of the otherwise applicable law, provided (2) that this state has

a materially greater interest than the state of the chosen law in the determination of the

particular issue."[34]  Section 188 of the Second Restatement, in relevant part, says:

(1)  The rights and duties of the parties with respect to an issue in contract are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the transaction and the parties under the principles stated in § 6

(2)  In the absence of an effective choice of law by the parties (see § 187), the contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include:

---

[33]1 Restatement (Second) of Conflict of Laws 2d:  Contracts, § 187, p. 561 (1971).

[34]*Id*. comment g. at 567-68.

20

(a)     the place of contracting,

    (b)     the place of negotiation of the contract,

    (c)     the place of performance,

    (d)     the location of the subject matter of the contract, and
    (e)     the domicil, residence, nationality, place of
            incorporation and place of business of the parties.

These contacts are to be evaluated according to their relative importance with
respect to the particular issue.[35]

Since no Kansas or federal statute tells this Court what law to apply in this proceeding, § 6

of the Second Restatement advises:

    (2)  . . . the factors relevant to the choice of the applicable rule of law include

        (a)     the needs of the interstate and international systems,

        (b)     the relevant policies of the forum,

        (c)     the relevant policies of other interested states and the
                relative interests of those states in the determination
                of the particular issue,

        (d)     the protection of justified expectations,

        (e)     the basic policies underlying the particular field of
                law,

        (f)     certainty, predictability and uniformity of result, and

        (g)     ease in the determination and application of the law
                to be applied.[36]

---

[35]*Id.* at 575.

[36]*Id.* at 10.

21

The Second Restatement's description of the various considerations that might affect the choice-of-law decision in this proceeding indicates just how complex the question can become. However, the Court has found opinions by federal circuit courts that should help simplify the decision here.

In *Electrical Distributors, Inc., v. SFR, Inc.*,[37] the Tenth Circuit followed the Second Restatement's theory in deciding whether the parties' choice of Colorado law to govern their contract could be applied to one party's covenant not to compete with the other in Utah. The Circuit concluded Utah had a materially greater interest than Colorado in controlling the validity of the covenant because the covenant would prohibit a Utah resident from being employed in a particular field of business in Utah.[38] Only if enforcing the covenant would not contradict a fundamental policy of Utah could the parties' choice of Colorado law be honored.[39] Since Sellner conducted in Minnesota the business that the Sellner-Consultants contract dealt with and he might also be a resident of that state, *Electrical Distributors* suggests the MFA will override the choice of Kansas law in the contract if Sellner can establish the contract constituted the sale of a "franchise" as defined by the MFA.

---

[37]166 F.3d 1074, 1083-86 (10th Cir. 1999).

[38]*Id.* at 1084.

[39]*Id.*

22

In *Cromeens, Holloman, Siebert, Inc. v. AB Volvo*,[40] a case involving assertions by franchisees located in Texas, Maine, and Montana that their local states' franchise laws prohibited them from waiving certain protections, the Seventh Circuit also applied the Second Restatement's theory and provided a framework for determining such choice-of-law questions. The court indicated the answers to the following questions would determine whether the franchisee's local state's law would override the parties' choice of another state's law to govern the matter being litigated: (1) whether the local state's franchise law would apply to the contract at issue; (2) if that franchise law would apply, whether the local state had a demonstrated public policy against allowing a choice-of-law provision to prevent its franchise law from applying to the contract; and (3) if the state had such a public policy, whether that state had a materially greater interest in the litigation than the contractually-chosen state.[41] It is clear that the MFA expresses a Minnesota public policy prohibiting a resident-franchisee from waiving the Act's protections. So, if Sellner can establish that the MFA would apply to the Sellner-Consultants contract, *Cromeens* indicates the Court would still need to determine whether Minnesota has a materially greater interest than Kansas does in the parties' litigation. At this point, the Court suspects Minnesota's interest would be greater (so long as the contract was the sale of a franchise) since Sellner ran his business there and was apparently a resident there as well, but the materials presented do not indicate where the parties made their contract.

---

[40]349 F.3d 376, 386-91 (7th Cir. 2003).

[41]*Id*. at 387.

Since Consultants was located in Kansas, Kansas's interest in the transaction may have been greater than has presently been shown.

Sellner's summary judgment materials are insufficient to enable the Court to determine the choice of law question, even assuming he will be able to establish the contract qualified as the sale of a franchise under the MFA.

6.      *Do the Debtor's alleged violations of the MFA constitute fraud under*

        *§ 523(a)(2)(A)?*

Although the conclusion Sellner's evidence has not established that the Sellner-Consultants contract constituted a sale of a franchise under the MFA requires that his summary judgment motion be denied, the Court feels compelled to address another shortcoming of his motion.  Even if the MFA applies and the Debtor is liable to Sellner for violations of that Act, the resulting debt is not necessarily excepted from the Debtor's discharge by § 523(a)(2)(A) of the Bankruptcy Code.  Minnesota law can control whether Sellner has a valid claim against the Debtor, but the dischargeability of any debt the Debtor may owe Sellner is a federal question governed by federal bankruptcy law.[42]

As indicated earlier, to establish that the Debtor owes him a debt covered by § 523(a)(2)(A) of the Bankruptcy Code, Sellner must prove:  (1) the Debtor made a representation; (2) at the time of the representation, the Debtor knew it to be false; (3) the Debtor made the representation with the intent to deceive Sellner; (4) Sellner justifiably

---

[42]*See Grogan v. Garner*, 498 U.S. 279, 283-84 & n. 10 (1991).

relied on the representation; and (5) Sellner sustained damage as a proximate result of the debtor making the representation.[43]  The MFA imposes liability in at least some situations where not all these elements are present.  For example, the MFA requires anyone who intends to sell a franchise in Minnesota to register the franchise with a state agency[44] and provide a public offering statement to any prospective purchaser,[45] and makes a franchise seller (and any person who controls a seller-firm or holds certain corporate offices of a seller-corporation[46]) who fails to meet these requirements liable to the franchisee "for damages caused thereby, for rescission, or other relief as the court may deem appropriate."[47]  These provisions impose liability without regard to the franchise seller's or agent's knowledge of the requirements, or the seller's or agent's intent to deceive the franchisee by violating the requirements, and without regard to the franchisee's reliance on representations the seller or its agent may have made.  In fact, Sellner argues he is entitled to summary judgment on the dischargeability question based solely on the alleged failure of Consultants and the Debtor to register their alleged franchise with the state and their

---

[43] *E.g., Fowler Bros. v. Young (In re Young),* 91 F.3d 1367, 1373 (10th Cir. 1996) (identifying these five elements of § 523(a)(2)(A) claim, but requiring creditor's reliance to be reasonable); *Field v. Mans*, 516 U.S. 59, 69-76 (1995) (reliance under § 523(a)(2)(A) need only be justifiable, overruling *Fowler Bros.* to extent it required reliance to be reasonable).

[44] Minn. Stat. Ann. § 80C.02 & § 80C.04 (specifying contents of application for franchise registration).

[45] Minn. Stat. Ann. § 80C.06, subd. 5.

[46] Minn. Stat. Ann. § 80C.17, subd. 2.

[47] Minn. Stat. Ann. § 80C.17, subd. 1.

alleged failure to give him a public offering statement.  Such violations clearly are sufficient to establish liability under the MFA for rescission (the remedy Sellner seeks in his motion), but just as clearly are not sufficient to show that the resulting liability is covered by § 523(a)(2)(A).  In other words, assuming Sellner can show the Debtor is liable to him under the MFA for these alleged violations, he will have to prove additional facts to establish that the Debtor's obligation to him is nondischargeable.

**CONCLUSION**

For these reasons, the Court concludes that Sellner's motion to strike the Debtor's response to the summary judgment motion must be denied, and that Sellner's motion for partial summary judgment must also be denied.